# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR606-026 |
| | ) | |
| CHARLES WILLIS, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a motion to suppress the evidence seized from his residence, place of business, and two rented storage units during the execution of state search warrants issued by a superior court judge on February 2, 2007. Doc. 476. The government filed a response in opposition to the motion, and defendant filed a supplement to his motion. Docs. 492, 513. The Court addressed this motion at a hearing on August 8, 2007 but declined defendant's request for an evidentiary hearing. For the following reasons, defendant's motion to suppress should be DENIED.

# I. BACKGROUND

On February 2, 2007, a state agent presented an application for a search warrant to a superior court judge seeking to search defendant's residence, business, and two storage units located in Fulton County, Georgia. Doc. 492, Ex. 2 (Affidavit and Application for Search Warrant). The affidavit for the warrant related that in March 2006 federal and state law enforcement agencies commenced an investigation of the "Julius Pinkston Drug Trafficking Organization." Id. at 2. After conducting a court-authorized interception of wire communications that was completed in June 2006,[1] the agents debriefed several principal participants of the organization, each of whom admitted to being involved in drug distribution activities. Id.

During his interview, Julius Pinkston stated that he met defendant Willis at the Jesup Federal Correctional Institution while both men were serving sentences for separate cocaine trafficking convictions. Id. According to Pinkston, the two men established a business relationship and

---

[1] On June 1, 2006, this Court authorized the interception of wire communications to and from a telephone believed to be used in furtherance of the drug conspiracy. SO-1021-DLM (Title III Order). The Court also approved the use of pen registers and trap and trace devices on April 12, 2006, May 22, 2006, and June 9, 2006. Docs. SO1001-DLM, SO1018-DLM, SO1020-DLM.

agreed to engage in for further cocaine trafficking upon their release from confinement. Id. Pinkston identified defendant as his source of supply and related that his largest single delivery of cocaine from Willis was four kilograms and that Willis usually charged $20,000 per kilogram. Id. Pinkston stated that "Willis hides cocaine in his business and residence" and furnished the agents with a description of both properties. Id. The agents then confirmed the location and defendant's ownership of the business and residence. Id.

The agents also interviewed Julius Pinkston's children, Michael Pinkston, Kimberly Pinkston, and Stephanie Collins. Michael Pinkston stated that he distributed cocaine for defendant and described Willis as the "ringleader" of the Pinkston organization. Id. at 2. When Michael Pinkston became involved in the organization, his father had been receiving multiple kilograms of cocaine from defendant on a weekly basis and Michael assisted his father in distributing the cocaine. Id. at 3. Michael stated that he had personally observed defendant deliver multi-kilogram quantities of cocaine and marijuana to Stephanie Collins's residence and, on one occasion, receive $16,000 as payment for prior drug sales. Id. at 2. Some of these

drug deliveries occurred between August and November 2005. Id.
According to Michael, Willis and his girlfriend are involved in a real estate
business that serves as a front for their drug activities. Id. At one point,
defendant told Michael that he received his cocaine from overseas in 500 to
600 kilogram shipments. Id.

Kimberly Pinkston admitted that she delivered cocaine and collected
money from drug customers at the direction of her father. Id. According
to Kimberly, defendant "fronted" Julius Pinkston his drug supply after he
was released from prison. Id. She described defendant as her father's
"source" and stated that on separate occasions she observed defendant
deliver as much as six kilograms of cocaine to her sister's residence in
Metter, Georgia and receive a $60,000 payment for drugs sold by the
Pinkston organization. Id.

Stephanie Collins stated that following her father's discharge from a
halfway house in April 2005, he began to distribute cocaine furnished by
defendant Willis. Id. On several occasions she traveled to Atlanta to pick
up cocaine at defendant's business located on Old National Highway. Id.
Defendant then began bringing multi-kilogram cocaine shipments to Metter

himself, and Collins provided details about the vehicles defendant drove, price negotiations and stash houses for the cocaine, and other participants in the drug distribution conspiracy. Id.

Agents later conducted surveillance of defendant's residence and business and noted that defendant's residence had been equipped with four closed-circuit security video cameras on each corner with infrared night vision recording capability. Id. at 3-4. Agents also confirmed that both defendant and Julius Pinkston had previously served federal prison sentences for drug crimes. Id. at 4.

On January 25, 2007, a DEA task force agent conducting a drug interdiction operation in Detroit, Michigan noticed a rental Penske truck parked outside a hotel. Id. The truck (which was listed as stolen because it was overdue for return) was registered under defendant Willis' name, as was a room at the hotel. Id. After learning that defendant was the subject of a drug investigation in Georgia and was wanted for arrest on federal charges, the agent positively identified Julius Pinkston as the individual who was checking out of the room registered to defendant. Id.

On February 1, 2007, federal agents arrested defendant at the

Savannah International Airport and conducted a search of his briefcase, where they discovered over $4,000 in currency (folded and secured by rubber bands), a Penske truck rental agreement, and numerous other documents, including two rental storage unit account statements listing defendant as the account holder. Id. During a post-arrest interview, defendant appeared calm and composed, but when asked about the contents of his storage units, he became nervous, apprehensive, and evasive. Id.

Finally, the affiant stated that based upon his training and experience as a GBI agent charged with investigating drug crimes, he was aware that cocaine traffickers frequently conceal drugs, currency, financial documents, travel and telephone records, and other indicia of their drug trafficking activities in their homes, businesses, automobiles, and rental storage facilities. Id. at 4-5.

## II. ANALYSIS

Defendant raises two arguments in his motion to suppress: (1) that the agent made material misstatements and omissions in the affidavit which he furnished to the superior court judge, and (2) that the affidavit did

not establish probable cause for the issuance of the warrant. Neither argument has any merit.

## A. Affiant's Veracity

Defendant contends that the affidavit in support of the search warrant omits certain pertinent information and contains misleading statements that undermine the probable cause basis for the warrant. Doc. 513. While there is no ban on challenging the veracity of a search warrant affidavit that is otherwise facially sufficient, it is well settled that there is no automatic right to make such a challenge. 2 Wayne R. LaFave, Search and Seizure § 4.4(d) (4th ed. 2004). A defendant who asks the court to look outside the four corners of the warrant is entitled to a hearing only if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . ." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).[2] Given the presumption of validity accorded to search

---

[2] Although Franks addressed only an alleged false statement in the search warrant affidavit, the reasoning of that case covers material omissions as well. United States v. Martin, 615 F.2d 318 (5th Cir. 1980); 2 LaFave, Search and Seizure § 4.4(b). "Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate . . . . For an omission to serve

warrant affidavits, the <u>Franks</u> Court insisted that the defendant meet a number of requirements before his challenge to the veracity of an affidavit could be heard:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they must be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

<u>Id</u>. at 171. Even upon such a showing, a hearing is required only "if the allegedly false statement is necessary to the finding of probable cause." <u>Id</u>. at 156.

Defendant contends that the warrant affidavit omits certain pertinent information critical to the determination of probable cause. Doc. 513. Specifically, defendant notes that the affidavit failed to mention (1) that Julius Pinkston had absconded following his interview, (2) that during his interview Michael Pinkston expressed his dislike of Willis or, (3) the

---

as the basis for a hearing under <u>Franks</u>, it must be such that its inclusion in the affidavit would defeat probable cause." <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990).

criminal history of each informant. Defendant, however, has failed to show that the affiant either intentionally or recklessly omitted this information, much less that the inclusion of this information would have defeated probable cause. Julius Pinkston's status as a fugitive at the time the warrant was sought is an interesting fact, but defendant does not explain how its omission undermined the reliability of "all" the information he provided during his earlier debriefing by the agents. Julius Pinkston admitted to the agents that he trafficked in large quantities of cocaine in the Metter area and identified Willis as his partner and supplier. The fact that Pinkston later became a fugitive (and remains so) reflects more of a desire to escape punishment than to fabricate evidence against Willis. Likewise, Michael Pinkston freely acknowledged his role as a drug distributor for his father, and his description of Willis' role in the drug enterprise was corroborated by each of the other individuals interviewed by the agents. His dislike of Willis—even if known by the affiant[3]—does not establish that he was lying to the agents or exaggerating defendant's role.

---

[3] Defendant refers to a single sentence in a DEA 6 prepared on January 16, 2007 by a Savannah DEA task force agent. Doc. 513, Ex. C, ¶ 2 ("Pinkston has never liked Willis . . . .") This DEA 6 was one of many investigative reports generated in this case.

Finally, while the affidavit does not detail the criminal histories of Julius Pinkston and his children (although it does reference Julius' conviction of a federal drug crime), this is a minor omission, for each is described as a self-acknowledged participant in a criminal enterprise involving the distribution of large quantities of cocaine. The affidavit, therefore, does not portray any of the government's sources in a false light.

Thus, there is no evidence that any of the cited omissions were designed to mislead the judge or that the inclusion of the information would have undermined probable cause. In other words, had all of the omitted information been included in the affidavit, the warrants would still have issued.

Defendant also alleges that the affidavit contains several misleading statements: (1) while the affidavit states that Julius Pinkston "identified his source of cocaine supply as Charles Willis," in fact Julius told the agents that he had several suppliers and that his main supplier was "Rico LNU;" (2) that the affidavit incorrectly states that agents conducted only "non-custodial" interviews of Julius Pinkston's children, whereas certain of the interviews occurred while these co-defendants were in custody; and (3)

while the affidavit indicates that Julius furnished the location and description of Willis' residence and business, in fact Pinkston provided only a general, non-detailed description of these properties. Doc. 513, at 7. But even if the agent deliberately or recklessly included these misstatements in his affidavit, defendant has failed to show that any of the cited misstatements is material to the finding of probable cause. Stating that Julius Pinkston identified Willis as "his source" of supply, thus implying that he was the sole source, is of little significance, since both Julius and his children acknowledged that Willis was a major supplier of cocaine to the Pinkston organization, often furnishing multi-kilogram quantities of the drug. Nor does the fact that some of the interviews were custodial rather than non-custodial constitute to a material falsehood. Finally, however non-specific Julius Pinkston's description of defendant's residence and business, that description was sufficient to enable the agents to locate those properties (which the agents then confirmed were owned by Willis).

A challenge to the truthfulness of an affidavit underlying a search warrant cannot be mounted without a threshold showing of material falsity. Defendant has failed to make such a "substantial preliminary showing."

Franks, 438 U.S. at 155. Accordingly, defendant was not entitled to an evidentiary hearing so that he could cross-examine the agent about what are clearly non-material deficiencies to his affidavit.

**B. Probable Cause**

Defendant also contends that the there was no probable cause to justify the issuance of the search warrants because the information supporting the affidavit is impermissibly stale and there is a lack of nexus between the alleged illegal activities and the locations searched. Doc. 513.

Defendant notes that the February 2, 2007 warrant affidavit was based on information that was primarily gathered during interviews conducted some seven months earlier and that pertained to events occurring during 2005 and early 2006. It is axiomatic that information furnished in an application for a search warrant must be timely, for probable cause is assessed at the time the warrant issues and cannot rest upon stale information. United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994); United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir. 1984), abrogated on other grounds by United States v. Lewis, 2007 WL 2033823

(11th Cir. 2007). "When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented." Harris, 20 F.3d at 450. "[E]ven stale information is not fatal if the government affidavit updates, substantiates, or corroborates the state material." Id. Furthermore, "[p]rotracted and continuous activity is inherent in large-scale drug trafficking operations. . . . In such cases, then, the staleness issue should be construed liberally." Bascaro, 742 F2d at 1346 (citation omitted); United States v. Hooshmand, 931 F.2d 725, 735 (11th Cir. 1991) ("when the alleged criminal activity is ongoing . . . it is unlikely that the passage of time will dissipate probable cause.").

In this case, the warrant affidavit relates a continuous drug traffiking enterprise that lasted longer than a year and involved the distribution of many kilograms of cocaine. See doc. 492, Ex. 2. Defendant was described as a key player in the conspiracy and a major supplier of drugs for the Pinkston organization. Although much of the information relates to events in 2005 and early 2006, agents developed information that Julius Pinkston

and defendant were engaged in a joint venture together in Michigan as late as January 2007, less than a month prior the issuance of the warrant. This information establishes a recent association between Pinkston and defendant and their probable continued involvement in drug trafficking.

Because the affidavit establishes that defendant was a major figure in the Pinkston drug trafficking organization and demonstrates a continuing association between Julius Pinkston and defendant, it was reasonable to infer that evidence of defendant's drug trafficking activities was concealed at his residence, business, and storage units at the time the warrant issued.

Defendant also contends that the warrant affidavit failed to demonstrate a sufficient nexus between the alleged illegal activities and the locations to be searched. Doc. 513. The Constitution protects citizens against "unreasonable searches and seizures" and provides specifically that no search warrant shall issue except "upon probable cause." U.S. Const. amend. IV. The Supreme Court has held that a search warrant should issue where the affidavit supporting the application for the search warrant establishes that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213,

238 (1983); see also United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). A court must consider the totality of the evidence in determining whether probable cause exists to justify the issuance of a search warrant, and that determination turns on the "assessment of probabilities in particular factual contexts. . . ." Gates, 462 U.S. at 232. The evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id.

It is the task of a reviewing court to determine whether the issuing judge had a "substantial basis" for finding probable cause. Gates, 462 U.S. at 238-39. While the Supreme Court has recognized "that the preference for warrants is more appropriately effectuated by according 'great deference' to a magistrate's determination," United States v. Leon, 468 U.S. 897, 914 (1984), "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239. "Even if the warrant application was supported by a more than 'bare bones' affidavit, a reviewing court may properly conclude that,

notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances. . . ." Leon, 468 U.S. at 915. In evaluating whether a substantial basis for probable cause exits, the reviewing court must consider whether the issuing judge made "'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying [the] hearsay information,' there is probable cause to issue the search warrant." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (quoting Gates, 462 U.S. at 238-39)).

Defendant's contention that the affidavit failed to establish a nexus between his criminal activities and his business is utterly without merit, for not only did Julius Pinkston state that defendant stored cocaine at his business, Stephanie Collins acknowledged that on two occasions she traveled to defendant's business on Old National Highway to pick up cocaine. Doc. 496, Ex. 2. Michael Pinkston also stated that defendant used his real estate business as a front for his drug activities. Agents then confirmed that defendant owned a business located at 4854 Old National

Highway, in College Park, Georgia. Id. This information furnished ample probable cause to believe that evidence of defendant's extensive drug trafficking activities would be found at his business.

Although Julius Pinkston stated that defendant hides cocaine in his residence and provided a physical description of the property, the affidavit does not detail the basis for Pinkston's allegation that Willis kept drugs at his home, and none of the other interviewees referenced defendant's residence in their statements to the agents. Doc. 492, Ex. 2. The agents, however, were able to locate defendant's residence using Pinkston's information. Further, the GBI agent who applied for the warrant stated in his affidavit that his education, training, and experience as a drug investigator led him to believe that drug traffickers frequently maintain and conceal drugs and drug-related items within their residences. As a number of courts have recognized, a defendant's role as a key figure in a drug organization is often sufficient, in and of itself, to infer probable cause for a search of his residence even without any direct observation of illegal activity. United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993) (recognizing that "in the case of drug dealers, evidence is likely to be found

where the dealers live"); United States v. Restrepo, 994 F.2d 173, 188-89 (5th Cir. 1993) (residence search upheld where affidavit suggested defendant's involvement in drug activity and officer stated his experience that drug traffickers maintain evidence of their illegal activities in their homes); United States v. Thomas, 989 F.2d 1252, 1254-55 (D.C. Cir. 1993) (defendant's drug activity created probable cause to search his residence even though there was no direct observation of illegal activity at his home); United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir.), (1990) (the required nexus between the defendant's criminal activity and his residence "need not rest on direct observation"). Such an inference is appropriate in this case, as the government conducted a careful and extended investigation that confirmed defendant's participation as a major player in a drug conspiracy involving the distribution of large quantities of cocaine. Viewing the evidence in its totality, the state judge had a substantial basis for finding probable cause to authorize a search of defendant's residence.

Upon defendant's arrest at the Savannah International Airport, agents searched his carry-on briefcase and discovered account statements for two storage units leased in defendant's name. Doc. 496, Ex. 2. During

questioning following his arrest, defendant's demeanor changed from calm to exceedingly nervous and evasive when asked about the contents of the storage units. Id. The agent seeking the warrant also stated that he knew through his training and experience that "common methods of operations of illegal drug traffickers include utilizing mini-warehouse self-storage type facilities to stash large quantities of cocaine." Id. Given the great deference that must be accorded to the superior court judge's determination, there was a probable cause basis for the issuance of warrants for the two storage units.

Given the totality of the information presented in the affidavit, the issuing superior court judge had a substantial basis for concluding that there was probable cause to believe that contraband was likely concealed in defendant's residence, business, and storage units.

## III. CONCLUSION

Defendant has not made the required preliminary showing that the affidavit was materially false, and therefore he is not entitled to an evidentiary hearing to contest the affiant's veracity. Reviewing the totality

of the evidence set forth in the affidavit, the issuing judge had a substantial basis for finding probable cause that evidence of defendant's criminal activities would be found in each of the locations sought to be searched. Accordingly, defendant's motion to suppress should be DENIED.

**SO REPORTED AND RECOMMENDED** this 20th day of **August, 2007.**

_____
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**